HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MEYER FLOOR COVERING INC., a Washington corporation,<br><br>                    Plaintiff,<br><br>     v.<br><br>TRAVELERS INDEMNITY CO., a Connecticut corporation,<br><br>                    Defendant. | No. 12-cv-5596-RBL<br><br>ORDER<br><br>(Dkt. #10) |

Plaintiff Meyer Floor Covering owns a warehouse and showroom in Tacoma, Washington. In January 2010, a fire erupted in the building next to Meyer's warehouse. Firefighters used Meyer's roof as a staging area for equipment and men, and in the process, damaged Meyer's roof. Meyer filed a claim with Travelers Indemnity, its insurer, for complete replacement of the roof. Travelers determined, however, that the extent of damage caused by the firefighters was small and offered substantially less than the cost of full replacement. Meyer filed suit, and Travelers requested appraisal of the loss. Here, Meyer moves for an order precluding appraisal, arguing that Travelers waived its contractual right to appraisal and that, in any event, appraisal cannot resolve the parties' dispute.

Order - 1

I.   **BACKGROUND**

**A. The Building and the Fire**

Meyer sells flooring and counter-tops out of its 10,000 square foot building. (Pl.'s Mot. in Opp. to Appraisal at 2.) The building consists of a flat section over the back showroom and ridged sections over the front:



*Id.* at 3. Meyer states that "[b]efore the fire, the roof had three small leaks above the front showroom," and these were "managed with tarps and were scheduled to have spot repairs." *Id.* Meyer intended, however, to simply fix the leaks rather than replace the roof as a whole. *Id.*

On January 18, 2010, the neighboring building burned in an electrical fire, and "the fire department spent several hours using Meyer's roof as a staging area and pouring water over and on the roof." *Id.* The firefighters' efforts, according to Meyer, caused "widespread damage," such that replacement of the roof was necessary. According to one of Meyer's owners, Alex Welcher, the "combined footfall, water, and smoke damage was so severe that we had to suspend our business operations until the building and roof could be repaired." (Welcher Decl. ¶ 4, Dkt. #12.) After the fire, the "roof had dozens of leaks"—new leaks on **both** the flat and ridged sections. *Id.* ¶ 5.

**B.     Post-Fire**

Meyer filed a claim for property damage and loss of income with Travelers. *Id.* Meyer aslo disclosed the three pre-fire roof-leaks to Robert Lewis, Travelers' adjuster. *Id.*

Mr. Lewis visited the building with a contractor from Belfor Construction, who found only minimal damage caused by firefighters and estimated repairs at $2,500. (Lewis Decl. ¶ 2.) Mr. Lewis states "[t]he roof was quite large in area and only a limited portion of it would have been accessed by the firefighters." *Id.* Mr. Lewis and the contractor "walked the roof, identified the footfall damage, and measured it." *Id.* Because the roof was "segmented"—i.e., containing both a flat and ridged sections—"it was possible to repair . . . without having to replace the entire roof." *Id.*

Mr. Welcher states that he conferred with Wendy Edmund, an insurance broker at Propel Insurance. Ms. Edmund advised that Travelers would likely cover only a third of the roof. (Welcher Decl. ¶ 6.) Meyer requested bids from three companies for the cost of full replacement and the cost of partial replacement. *Id.* The companies estimates for partial repairs were: $15,445 (Legends Roofing); $16,324 (Bosnick Roofing); and $9,163.61 (Guardian Roofing). However, both Guardian and Bosnick stated that entire roof needed replacement. "The fact that there is so many different areas that are affect from [sic] the extensive water infiltration and holes from fire fighters that spot repairs would not effectively or permanently fix any problems." (*Id.*, Ex. D, Letter from Bosnick Roofing, Dkt. #12-2 at 9.) Bosnick explained that "large amounts of water that h[ave] saturated the insulation and wood" and "mold and rot [would] start to form" if the building was not completely re-roofed. *Id.* Likewise, Guardian recommended complete replacement: "Due to the age of the roof and multiple layers of material that was on the roof it would not have been possible for our company to repair the roof and guarantee that leaks would not re-occur unless the roof was removed and replaced." (*Id.*, Ex. D, Letter from Guardian Roofing, Dkt. #12-2 at 5.)

Guardian replaced the entire roof in March 2010 for $49,566.66. *Id.* ¶ 6. Meyer submitted the claim in November 2010 (presumably along with other expenses not relevant here). *Id.* ¶ 6. Following the roof's replacement and the claim, the parties negotiated a number

of issues. Because the parties dispute whether Travelers waived its right to appraisal, it is important to understand these negotiations and their timing.

**C. Negotiations**

Mr. Welcher states that he did not hear from Travelers, so he emailed Mr. Lewis on January 10, 2011, requesting information on a number of issues, including the roof: "The roof replacement caused by the damage from the fire, and the fireman running and climbing all over it has been submitted . . . and still hasn't been paid! why? [sic]" (*Id.*, Ex. D, Dkt. #12-2 at 14.) Mr. Lewis responded to five separate issues that Mr. Welcher raised. Regarding the roof, Mr. Lewis reiterated the Travelers would not pay more than $2,500: "[W]e have indicated that from our conversation with Belfor that an amount of $2,500 was fair and reasonable for the roof repairs for the minimal damage that was caused by the fire department." *Id.* Mr. Lewis argued that the roof needed replacement even before the fire: "The roof was, unfortunately, well beyond its serviceable life," and while "the entire roof need[ed] to be replaced," Travelers believed only "spot repairs [were] necessary to address any damage from footfall." (Welcher Decl., Ex. E, Dkt. #12-2 at 13.)

Meyer hired Drew Lucurell, a public adjuster with Adjusters International, to present their claims to Travelers. *Id.* ¶ 8. Mr. Lucurell spent "approximately the next 12 months" negotiating with Travelers regarding the outstanding claims. On December 13, 2011 (a little more than a year after Meyer originally submitted its claim for reimbursement), Mr. Lucurell emailed Travelers that "we are not in agreement with the Roof issue," and reiterated Meyer's claim for the full cost of replacement. (Lewis Decl., Ex. A, Dkt. #18 at 4.)

On February 6, 2012, Mr. Lucurell emailed Travelers, stating "the roof [issue] still remains open." (Lewis Decl., Ex. B, Dkt. #18 at 5.) On April 13, 2012, Travelers offered to settle the roof issue for $9,163.61—the Guardian Roofing estimate. (Winchell Decl., Ex. B, Dkt. #11 at 20.) Mr. Lucurell declined: "We are not interested in your offer. . . . My previous offer remains open. If you are not interested please let us know." *Id.*

Meyer filed suit on June 6, 2012.

**D.  Policy**

Travelers' policy provides for the cost or repair or replacement or the value of damaged property:

> **Loss Payment — Building and Personal Property**
> In the event of loss or damage . . . at our option, we will either:
> (1) Pay the value of lost or damaged property;
> (2) Pay the cost of repairing or replacing the lost or damage property . . . ;
> We will determine the value of lost or damaged property, or the cost of its repair or replacement . . . as follows:
> (1) At replacement cost (without deduction for depreciation) . . .
> (a) We will not pay on a replacement cost basis for any loss or damage:
> i. Until the lost or damaged property is actually repaired or replaced; and
> ii. Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

(Winchell Decl., Ex. A., Dkt. #11 at 3–5.)  If the parties cannot agree on the amount of loss, the policy provides an appraisal process:

> If we and you disagree on the value of the property . . . or the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser.

*Id.*  The two appraisers then choose an "umpire" and "state separately the value of the property . . . or the amount of loss."  *Id.*  If the appraisers cannot agree, the umpire will decide.  *Id.*

**E.  Dispute**

The parties agree that the policy covers damages caused by the fire and the firefighters.  The parties disagree, however, as to the extent of damage.  Meyer believes the firefighters caused sufficient damage "necessitat[ing] complete replacement of the roof."  (Pl.'s Mot. in Opp. to Appraisal at 1.)  Travelers believes that the need for replacement arises from wear-and-tear— only minimal damage was caused by the firefighters.  Travelers seeks appraisal to determine what damages were caused by the firefighters and what damage was pre-existing.  (*See* Def.'s Resp. at 8, Dkt. #17) ("the appraisers must necessarily determine the scope of damage").

Meyer presents two arguments. First, Meyer argues that the appraisal request is tardy, and Travelers thus waived its right to appraisal. Second, and regardless of waiver, Meyer contends that appraisal cannot solve the dispute at all. It argues that the dispute is one of causation, not the amount of loss or cost of repair. Indeed, the parties appear to agree that the roofing estimates are accurate: $49,566.66 for a full replacement and approximately $9,000 to $16,000 for a third of the roof. The issue, according to Meyer, is not the dollar valuation, but what actually caused the roof to leak—firefighters or age?

## II.   DISCUSSION

Appraisal "provides a method for establishing the dollar value of damage sustained." *Keesling v. Western Fire Ins. Co. of Fort Scott, Kansas*, 10 Wash. App. 841, 845 (1974). Appraisal provisions are "justified in the expectation that [they] will provide a plain, inexpensive, and speedy determination of the extent of the loss." *Id.* (citing *Kavli v. Eagle Star Ins. Co.*, 206 Minn. 360 (1939)). Despite the independence of appraisers, "authority and control over the ultimate disposition of the subject matter remains with the courts." *Id.* (citing *Hanby v. Maryland Cas. Co.*, 265 A.2d 28 (Del. Sup. Ct. 1970)) (additional citations omitted). Appraisal awards are "conclusive as to the amount of loss," and may be challenged "only with respect to fairness of the appraisal process." *Kochendorfer v. Metropolitan Property & Cas. Ins. Co.*, No. 11-cv-1162, 2012 WL 1204714 (W.D. Wash. Apr. 11, 2012) (quoting in part *Bainter v. United Pac. Ins. Co.*, 50 Wash. App. 242, 246 (1988)). Here, the Court must conclude that appraisal is waived, and thus, it declines to address Meyer's additional argument.

The timeliness of an appraisal demand "in each case depends upon the circumstances as they existed at the time the demand was made." *Keesling*, 10 Wash. App. at 847. The Washington Supreme Court cited two factors that have "principally . . . been decisive" in determining waiver: (1) whether and when there was a "breakdown of good-faith negotiations concerning the amount of loss; and (2) whether a party suffered "prejudice resulting from the delay." *Id.* at 849.

First, the sheer length of time between Meyer's demand and the request for appraisal suggests that the right was waived. The fire occurred two-and-a-half years before Travelers

demanded appraisal. Indeed, Travelers requested appraisal only after months of negotiations with Meyer itself, well more than a year of negotiation with Meyer's hired adjuster, and years after the new roof was installed.

Second, good-faith negotiations appear to have broken down long ago. Meyer has demanded payment for the full cost of replacement since 2010, and it has not changed that position. Whether correctly or not (and the Court takes no position on the matter at this time), Travelers offered $2,500—vastly less than the nearly fifty-thousand dollar demand. The chasm between Meyer's demand and Travelers' offer reflects the parties' drastically different beliefs as to the extent of damage caused by the firefighters. And on that factual issue, the parties have never agreed.

It is true, however, that the parties exchanged emails until April 2012, two months before Meyer filed suit. Given the context, however, these communications carry little weight. The roof issue survived for three years only because it was buried amongst Meyer's other outstanding claims, which slowly dwindled until only the roof remained. In other words, it did not survive because the parties were engaged in a good-faith negotiation about the roof. Moreover, Meyer appeared open to an offer somewhere in the neighborhood of fifty-thousand dollars. For more than two years, Travelers offered $2,500. The fact that Travelers later offered $9,163.6—a sum less than one-fifth of Meyer's demand—suggests that it knew the parties were not at all close to agreement. In short, the communications between the parties in late 2011 and 2012 suggest entrenched positions, not negotiations.

Third, Meyer has been prejudiced by the delay. As the Washington courts have stated, appraisal serves as a "plain, inexpensive, and speedy determination of the extent of the loss." *Keesling*, 10 Wash. App. at 845. It has been anything but that. Meyer has paid Mr. Lucurell to represent it for two years, and Meyer has paid attorney's fees and the costs of this suit.

Lastly, the Court has concerns regarding the accuracy of any possible appraisal at this point. Travelers argues that the appraisers must determine the condition of the roof before the fire, the damage caused by the firefighters, and the necessity of full replacement. But the roof was replaced in March 2010—almost three full years ago.

### III. CONCLUSION

For the reasons stated above, Meyer's Motion Opposing Appraisal (Dkt. #10) is **GRANTED**.

Dated this 28th day of January 2013.

Ronald B. Leighton
United States District Judge